ORIGINAL
FILED

1  MELISSA GOODMAN (NY SB # 4224333) DEC 14 PH 12: 18
   mgoodman@aclu.org                    RICHARD W. WIEKING
2  JAMEEL JAFFER (NY SB # 3064201)     CLERK, U.S. DISTRICT COURT
   jjaffer@aclu.org                    NORTHERN DISTRICT OF CALIFORNIA
3  L. DANIELLE TULLY (NY SB # 4334512)
   dtully@aclu.org
4  American Civil Liberties Union Foundation
   125 Broad Street, 18th Floor
5  New York, NY 10004-2400
   Telephone: (212) 549-2500                    CINDY COHN (SB # 145997)
6  Facsimile: (212) 549-2680                    cindy@eff.org
                                                KURT OPSAHL (SB # 191303)
7  ANN BRICK (SB # 65296)                       kurt@eff.org
   abrick@aclunc.org                            MARCIA HOFMANN (SB # 250087)
8  American Civil Liberties Union Foundation    marcia@eff.org
      of Northern California, Inc.              Electronic Frontier Foundation
9  39 Drumm Street                              454 Shotwell Street
   San Francisco, CA 94111                      San Francisco, CA 94110
10 Telephone: (415) 621-2493                    Telephone: (415) 436-9333
   Facsimile: (415) 255-8437                    Facsimile: (415) 436-9993

11 Counsel for Plaintiffs

12 *Pro hac vice applications to be filed upon the assignment of this case to a judge.

SEALED
BY COURT ORDER

CW

13                    UNITED STATES DISTRICT COURT
                   FOR THE NORTHERN DISTRICT OF CALIFORNIA
14                         SAN FRANCISCO DIVISION

15 INTERNET ARCHIVE; AMERICAN CIVIL          Case No.
16 LIBERTIES UNION; AMERICAN CIVIL
   LIBERTIES UNION FOUNDATION;
17 AMERICAN CIVIL LIBERTIES UNION OF          COMPLAINT FOR DECLARATORY
   NORTHERN CALIFORNIA, INC.;                 AND INJUNCTIVE RELIEF
18 AMERICAN CIVIL LIBERTIES UNION
19 FOUNDATION OF NORTHERN
   CALIFORNIA, INC.; and ELECTRONIC           DOCUMENT SUBMITTED UNDER
20 FRONTIER FOUNDATION,                       SEAL
                              Plaintiffs,
21        v.

22 MICHAEL B. MUKASEY, in his official
   capacity as Attorney General of the United
23 States; ROBERT S. MUELLER III, in his
   official capacity as Director of the Federal
24 Bureau of Investigation; and ARTHUR M.
   CUMMINGS II, in his official capacity as
25 Deputy Assistant Director of the
   Counterterrorism Division of the Federal Bureau
26 of Investigation,
27                            Defendants.

28

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

1.     Plaintiffs the Internet Archive ("the Archive"), the American Civil Liberties Union ("ACLU"), the American Civil Liberties Union Foundation ("ACLUF"), the American Civil Liberties Union of Northern California, Inc. ("ACLU-NC"), the American Civil Liberties Union Foundation of Northern California, Inc. ("ACLUF-NC"), and the Electronic Frontier Foundation ("EFF") challenge the facial and as-applied constitutionality of 18 U.S.C. §§ 2709, 3511 (collectively, "the NSL statute"), which authorize the Federal Bureau of Investigation ("FBI") to issue national security letters ("NSLs") and to impose broad and effectively permanent non-disclosure obligations on those served with NSLs. *See* 18 U.S.C. §§ 2709, 3511, as amended by the USA PATRIOT Act, Pub. L. 107-56 ("Patriot Act"); by the USA PATRIOT Improvement and Reauthorization Act of 2005, Pub. L. 109-177 ("PIRA"); and by the USA PATRIOT Act Additional Reauthorizing Amendments Act of 2006, Pub. L. 109-178 ("ARAA").

2.     The Archive is a digital library co-founded by Brewster Kahle and incorporated as a 501(c)(3) non-profit organization in California. An agent of the FBI served an NSL (the "November 2007 NSL") on the Archive through its legal representative, EFF, on November 26, 2007. The November 2007 NSL directed the Archive to disclose records pertaining to one of its patrons. The November 2007 NSL also referenced the NSL statute's gag provisions codified in 18 U.S.C. §§ 2709(c), 3511(b), and expressly prohibited the Archive, its officers, employees, and agents from disclosing that the FBI had demanded information from it through the NSL.

3.     The NSL statute is unconstitutional because its gag and secrecy provisions violate the First and Fifth Amendments and because those provisions are not severable from the remainder of the NSL statute. The statute allows the FBI to issue gag orders prohibiting NSL recipients from disclosing that the FBI has sought or obtained information from them. The gag orders are issued by the FBI unilaterally, without prior judicial review. While the statute permits NSL recipients to challenge gag orders in court, reviewing courts are permitted to modify or vacate such orders only in extraordinary circumstances, and in some instances they are required to treat the FBI's certification that secrecy is necessary as conclusive. In

1   addition, the NSL statute throws a heavy blanket of secrecy over litigation relating to NSLs.

2   Notably, the one court that has already considered the constitutionality of the NSL statute

3   concluded that the law's gag provisions violate the First Amendment and the principle of

4   separation of powers, and that the entire statute is unconstitutional because those gag

5   provisions are not severable. *Doe v. Gonzales*, 500 F. Supp.2d 379 (S.D.N.Y. 2007).

6       4.    For these reasons and others set forth below, Plaintiffs seek, *inter alia*, a

7   declaration that the NSL statute is unconstitutional on its face and an injunction prohibiting the

8   FBI from issuing NSLs under the statute. Plaintiffs also seek a declaration that the November

9   2007 NSL is unconstitutional and an injunction prohibiting the FBI from enforcing it. The

10  Archive would comply with a lawful demand for information and in the past has complied with

11  lawful government subpoenas. It should not, however, be required to comply with demands

12  issued under a statute that is unconstitutional on its face.

13

14                          **JURISDICTION AND VENUE**

15      5.    This case arises under the United States Constitution and the laws of the United

16  States and presents a federal question under Article III of the United States Constitution and 28

17  U.S.C. § 1331. The Court also has authority to grant declaratory and injunctive relief pursuant

18  to the Declaratory Judgment Act, 28 U.S.C. § 2201, *et seq.* The Court has authority to award

19  costs and attorneys' fees under 28 U.S.C. § 2412.

20      6.    Venue is proper in this district under 28 U.S.C. § 1391(e).

21

22                          **INTRADISTRICT ASSIGNMENT**

23      7.    This case is properly assigned to the San Francisco Division pursuant to Civil

24  Local Rule 3-2(c) and (d) because a substantial portion of the events giving rise to this action

25  occurred in the County of San Francisco.

26  //

27  //

28

-3-

**PARTIES**

8.    The Archive is a digital library founded in 1996, incorporated as a 501(c)(3) non-profit organization with its principal place of business in San Francisco, California. The Archive offers permanent access for researchers, historians, and scholars to its vast and growing collections of books, videos, web pages, software and other digital information. The Archive sues on its own behalf.

9.    Plaintiff ACLU is a nationwide, non-profit, non-partisan organization with more than 500,000 members dedicated to the constitutional principles of liberty and equality. The ACLU is a 501(c)(4) organization. The ACLU's activities include lobbying Congress on legislation that affects civil liberties, analyzing and educating the public about such legislation, and mobilizing ACLU members and activists to lobby their legislators to protect civil rights and civil liberties. The ACLU sues on its own behalf and on behalf of its members.

10.    Plaintiff ACLUF is a 501(c)(3) organization that educates the public about civil liberties and that employs lawyers who provide legal representation free of charge in cases involving civil liberties. As counsel to the Archive and privy to the information contained in the NSL served on the Archive, lawyers employed by ACLUF are subject to the NSL statute's gag provisions.

11.    Plaintiff ACLU-NC is the largest regional affiliate of the ACLU, with more than 50,000 members. The ACLU-NC is a 501(c)(4) organization. The ACLU-NC's activities include lobbying the state legislature and members of the Northern California Congressional delegation on legislation that affects civil liberties, analyzing and educating the public about such legislation, and mobilizing ACLU-NC members and activists to lobby their legislators to protect civil rights and civil liberties. The ACLU-NC sues on its own behalf and on behalf of its members.

12.    Plaintiff ACLUF-NC is a 501(c)(3) organization that educates the public about civil liberties and that employs lawyers who provide legal representation free of charge in cases involving civil liberties. As counsel to the Archive and privy to the information contained in

-4-

1  the NSL served on the Archive, lawyers employed by ACLUF-NC are subject to the NSL
2  statute's gag provisions.

3      13.    Plaintiff EFF is a non-profit civil liberties organization working to protect rights
4  in the digital world. EFF actively encourages and challenges industry and government to
5  support free expression and privacy in the information society. Founded in 1990, EFF is based
6  in San Francisco, California. As counsel to the Archive and privy to the information contained
7  in the NSL served on the Archive, lawyers employed by EFF are subject to the NSL statute's
8  gag provisions.

9      14.    Defendant Attorney General Michael Mukasey heads the United States
10 Department of Justice ("DOJ"), which is the agency of the United States government
11 responsible for enforcing federal criminal laws and overseeing domestic intelligence
12 investigations. Defendant Mukasey has ultimate authority for supervising all of the DOJ's
13 operations and functions. The DOJ includes the FBI, the agency authorized to use the law
14 challenged in this case.

15     15.    Defendant Robert Mueller is the Director of the FBI and is responsible for
16 supervising all of that agency's operations. The FBI is the agency authorized to use the law
17 challenged in this case.

18     16.    Defendant Arthur M. Cummings II is a Deputy Assistant Director of the FBI's
19 Counterterrorism Division. Defendant Cummings signed the November 2007 NSL issued to
20 the Archive.

21

22                      **STATUTORY BACKGROUND**

23                          The NSL Authority

24     17.    The NSL statute was enacted by Congress in 1986 as part of the Electronic
25 Communications Privacy Act of 1986. *See* Pub. L. 99-508, Title II, § 201 (codified as 18
26 U.S.C. § 2510 *et seq.*). As described further below, the NSL statute has been modified
27 multiple times since its initial passage.

28

18.     In its current form, the NSL statute authorizes the FBI to issue NSLs ordering "wire or electronic communication service provider[s]" to disclose "subscriber information," "toll billing records information," and "electronic communication transactional records" upon a certification that the information sought is "relevant to an authorized investigation to protect against international terrorism or clandestine intelligence activities." 18 U.S.C. §§ 2709(a), (b)(1). The NSL statute also allows the FBI to impose non-disclosure obligations, or gag orders, on anyone it serves with an NSL.

19.     As originally enacted, the NSL statute could be used exclusively against people suspected of espionage. The FBI could issue NSLs only if it certified that (i) the information sought was relevant to an authorized foreign counterintelligence investigation; *and* (ii) there were specific and articulable facts establishing reason to believe that the subject of the NSL was a foreign power or foreign agent. 18 U.S.C. § 2709 (1986). Congress subsequently amended the statute in 1993 and 1996, each time extending its reach. *See* Pub. L. 103-142 (1993); Pub. L. 104-293, Title VI, § 601(a) (1996).

20.     In 2001, through the Patriot Act, Congress expanded the FBI's power to issue NSLs once again by, *inter alia*, removing the individualized suspicion requirement. Pub. L. 107-56, Title V, § 505(a). The NSL statute now permits the FBI to issue an NSL if the information sought is believed to be "relevant" to "an authorized investigation to protect against international terrorism or clandestine intelligence activities." *See* 18 U.S.C. § 2709(b)(1). Consequently, the FBI may now use NSLs to obtain sensitive information about innocent individuals who have no connection to terrorism or espionage. The statute does not require the FBI to seek judicial approval prior to issuing an NSL.

21.     Pursuant to amendments made to the NSL statute in 2006, the Attorney General may compel compliance with the NSL request by "invok[ing] the aid of any district court of the United States within the jurisdiction in which the investigation is carried on or the person or entity [served with the NSL] resides, carries on business, or may be found." 18 U.S.C.

-6-

1   § 3511(c).  If a court issues an order requiring compliance with an NSL, non-compliance may

2   be punished by the court as contempt.  *Id.*

3       22.    Although NSL recipients were initially prohibited from challenging NSLs,

4   Congress amended the statute in 2006 to permit those served with NSLs to "petition for an

5   order modifying or setting aside the request." *Id.* § 3511(a).  If the recipient of an NSL files

6   such a petition, the reviewing court may modify or set aside the NSL "if compliance would be

7   unreasonable, oppressive, or otherwise unlawful." *Id.*

8                            <u>Gag and Secrecy Provisions</u>

9       23.    In its current form, the NSL statute allows the Director of the FBI or his

10  designee (including a Special Agent in Charge of a Bureau field office) to impose a broad and

11  effectively permanent non-disclosure order – or gag order – on any person or entity served with

12  an NSL.  18 U.S.C. § 2709(c).

13      24.    The Director or his designee can impose this gag order simply by "certifying" to

14  himself or herself that, absent the non-disclosure obligation, "there may result a danger to the

15  national security of the United States, interference with a criminal, counterterrorism, or

16  counterintelligence investigation, interference with diplomatic relations, or danger to the life or

17  physical safety of any person." *Id.* § 2709(c)(1).  Once the Director of the FBI or his designee

18  so certifies and notifies the NSL recipient, the recipient of the NSL is prohibited from

19  "disclos[ing] to any person (other than those to whom such disclosure is necessary to comply

20  with the request or an attorney to obtain legal advice or legal assistance with respect to the

21  request) that the [FBI] has sought or obtained access to information or records under [the NSL

22  statute]." *Id.* The gag order extends to any person consulted in order to comply with the NSL,

23  and to any attorney consulted for legal advice or assistance with respect to the request. *Id.*

24      25.    The gag order is imposed upon the FBI's certification.  No judge considers,

25  before the gag order is imposed, whether secrecy is necessary or whether the gag order is

26  narrowly tailored.

27

28

1      26.    The gag provisions permit the recipient of an NSL to petition a court "for an

2  order modifying or setting aside a nondisclosure requirement." *Id.* § 3511(b)(1).  The

3  reviewing court, however, may modify or set aside the nondisclosure requirement only if it

4  finds that there is "no reason to believe that disclosure may endanger the national security of

5  the United States, interfere with a criminal, counterterrorism, or counterintelligence

6  investigation, interfere with diplomatic relations, or endanger the life or physical safety of any

7  person." *Id.* § 3511(b)(2).  If a designated senior government official certifies that "disclosure

8  may endanger the national security of the United States or interfere with diplomatic relations,"

9  the certification must be "treated as conclusive unless the court finds that the certification was

10  made in bad faith." *Id.*

11      27.    In the case of a petition filed under § 3511(b)(1) "one year or more after the

12  request for records," the FBI Director or his designee must either terminate the non-disclosure

13  obligation within 90 days or recertify that disclosure may result in one of the enumerated

14  harms. *Id.* § 3511(b)(3).  If the FBI recertifies that disclosure may be harmful, however, the

15  reviewing court is required to apply the same extraordinarily deferential standards it applies to

16  petitions filed within one year. *Id.*  If a designated senior official recertifies that disclosure

17  may endanger the national security of the United States or interfere with diplomatic relations

18  the recertification must be "treated as conclusive unless the court finds that the recertification

19  was made in bad faith." *Id.*

20      28.    Those who violate a gag order issued under the NSL statute may be subject to

21  criminal penalties. *See* 18 U.S.C. § 1510(e) ("Whoever, having been notified of the applicable

22  disclosure prohibitions or confidentiality requirements of [the NSL statute] . . . knowingly and

23  with the intent to obstruct an investigation or judicial proceeding violates such prohibitions or

24  requirements applicable by law to such person shall be imprisoned for not more than five years,

25  fined under this title, or both.").

26      29.    Petitions challenging NSL record demands and gag orders are required by the

27  PIRA and ARAA to be heard in extraordinary secrecy.  A reviewing court must "close any

28

1  hearing to the extent necessary to prevent an unauthorized disclosure of a request for records."

2  18 U.S.C. § 3511(d). The court must also keep petitions, records, filings, orders and subpoenas

3  under seal "to the extent and as long as necessary to prevent the unauthorized disclosure." *Id.*

4  Upon request of the government, the reviewing court is also required to "review *ex parte* and *in*

5  *camera* any government submission or portions thereof, which may include classified

6  information." *Id.* § 3511(e).

7

8                              **FACTUAL BACKGROUND**

9        30.    The Archive was established as a digital library in 1996. Its overarching

10  mission is to provide universal access to all knowledge. Located and incorporated as a

11  501(c)(3) non-profit in California, the Archive is governed by a three-member board of

12  directors. The Archive has more than one hundred employees.

13       31.    The Archive is not a traditional library, but it is a library nonetheless. It is

14  formally recognized as a library by the State of California, enabling it to satisfy the statutory

15  definition of a library found in the 1996 Library Services and Technology Act, 20 U.S.C.

16  § 9122(1)(E). The Archive has been a member of the American Library Association since

17  2000.

18       32.    To fulfill its mission, the Archive works with national libraries, museums,

19  universities, and the general public to collect and offer free access to materials in digital

20  format. Some of its partners include the Library of Congress, the National Archives, and the

21  British Library. The Archive has collected snapshots of billions of public web pages, except

22  those that have opted not to be archived, every two months for the last ten years. In addition,

23  the Archive has digitized archival and educational movies since 1999. The Archive also

24  accepts donated material, including audio and video recordings, from individual patrons. To

25  ensure continued access, the Archive provides permanent, archival storage and preservation

26  services for this extensive digital material.

27

28                                    -9-

33.    The Archive has been involved in several book digitization projects and has formed the Open Content Alliance, which includes contributions from more than seventy contributing libraries, to build joint collections of digitized public domain books. The Archive's book collection now contains over 200,000 volumes.

34.    As a library, the Archive actively works to serve its patrons as a resource for exploration, research, and learning. Many of the Archive's resources come from patrons' donations. Providing a safe environment for patrons' activities has long been an important function of libraries with physical materials. The Archive seeks to continue this practice for those patrons interacting with digital materials through its website.

35.    Just as an individual may anonymously walk into a non-digital library and browse its shelves, an individual wishing to view digital materials may browse those materials on the Archive's website as an "anonymous user" – that is to say, without logging in to the website. However, individuals who would like to upload materials, post reviews, or communicate on message boards must first register with the Archive and be logged into his or her account. To register, an individual must agree to "Terms of Use," provide a "valid" (although unverified) e-mail address, create a password, and supply a screen name.

<u>The November 2007 NSL</u>

36.    The Archive has worked with various federal government agencies, including the DOJ, the FBI, and the Central Intelligence Agency. Many U.S. Attorneys and other law enforcement officials find the Archive a valuable resource, and the Archive has regularly received requests for information about its collections (most frequently, for information stored in the Wayback Machine, a historical archive of websites).

37.    In July of 2007, Special Agent Scott Rakowitz and Supervisory Special Agent Chuck Esposito of the San Francisco office of the FBI met with EFF, whose attorneys represent the Archive for various purposes. At that meeting, EFF agreed that it would accept service of legal process from the United States on behalf of the Archive.

-10-

38.    On Monday, November 26, 2007, Supervisory Special Agent ████ left a
voicemail message for Kurt Opsahl, a Senior Staff Attorney at EFF.  Similar messages were
left with Senior Staff Attorney Lee Tien and Staff Attorney Kevin Bankston.  The messages
informed them that an FBI agent would be coming to EFF's office that day.  Bankston returned
the message, spoke with Supervisory Special Agent ████ and learned that an FBI agent
would be serving an NSL at EFF's office.

39.    Later that morning, Special Agent ████████ arrived at EFF's office, met
with Bankston, and served an NSL dated November 19, 2007 ("November 2007 NSL").  The
November 2007 NSL is printed on FBI letterhead, is addressed to the Internet Archive, and is
signed by Arthur M. Cummings II, Deputy Assistant Director, Counterterrorism Division of the
FBI.

40.    The November 2007 NSL letter states that the Archive is "hereby directed to
provide the [FBI] the subscriber's name, address, length of service, and electronic
communication transactional records, to include existing transaction/activity logs and all
electronic mail (e-mail) header information (not to include message content and/or subject
fields)" pertaining to ████████████████████████
████████

41.    The November 2007 NSL also includes a certification that "the information
sought is relevant to an authorized investigation to protect against international terrorism or
clandestine intelligence activities."

42.    Parroting the language of the NSL statute's gag certification provision, the
November 2007 NSL includes a certification that the "disclosure of the fact that the FBI has
sought or obtained access to the information sought by this letter may endanger the national
security of the United States, interfere with a criminal, counterterrorism, or counterintelligence
investigation, interfere with diplomatic relations, or endanger the life or physical safety of a
person."  The certification does not specify which of these harms may result from disclosure.

-11-

43.     The November 2007 NSL further advises the Archive that the NSL statute "prohibits you, or any officer, employee, or agent of yours, from disclosing this letter, other than to those to whom disclosure is necessary to comply with the letter or to an attorney to obtain legal advice or legal assistance with respect to this letter."

44.     Appended to the November 2007 NSL is a page titled "ATTACHMENT" that states, "In preparing your response to this National Security Letter, you should determine whether your company maintains the following types of information which may be considered by you to be an electronic communications transactional record in accordance with Title 18 United States Code Section 2709." The page then lists, among other things ▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮ and "Any other information which you consider to be an electronic communication transactional record."

45.     The November 2007 NSL requires that the Archive provide the requested information "personally to a representative of the FBI ▮▮▮▮▮▮▮ or through use of delivery service or through secure fax within fourteen (14) business days of receipt of this letter."

46.     On Tuesday, November 27, 2007, Opsahl and EFF Staff Attorney Marcia Hofmann brought the November 2007 NSL to the Archive and showed it to Brewster Kahle, Chair of the Archive's Board of Directors as well as one of the Archive's Digital Librarians.

47.     On Wednesday, November 28, 2006, Special Agent ▮▮▮▮ left a message for Bankston inquiring about the status of the Archive's response. Later that day, Opsahl spoke by telephone with Special Agent ▮▮▮▮ and informed him that the Archive was reviewing and considering the letter, and notified him, pursuant to 18 U.S.C. § 2709(c)(4), that the Archive would be bringing in additional counsel.

48.     The NSL statute and the November 2007 NSL have prevented the Archive from disclosing information about the November 2007 NSL and this lawsuit to the Archive's Board of Directors and staff.

-12-

49.    The NSL statute and the November 2007 NSL have prevented the Archive from disclosing information about the November 2007 NSL and this lawsuit to the Archive's patrons.

50.    The NSL statute and the November 2007 NSL have prevented the Archive from disclosing information about the November 2007 NSL and this lawsuit to other libraries.

51.    The NSL statute and the November 2007 NSL have prevented the plaintiffs from disclosing information about the November 2007 NSL and this lawsuit to the press and public.

52.    The NSL statute and the November 2007 NSL have prevented the plaintiffs from disclosing information about the November 2007 NSL to Congress, where bills to amend the NSL statute are currently pending in both the House and Senate. The NSL statute and the November 2007 NSL have prevented the plaintiffs from publicly advocating for legislative change with respect to the NSL statute.

## CAUSES OF ACTION

53.    The NSL statute, on its face and as applied through the November 2007 NSL, violates the First Amendment by investing the FBI with the authority to suppress speech without meaningful judicial review, unconstrained by definite and objective standards, and without requiring that gag orders issued under the statute be narrowly tailored to a compelling government interest.

54.    The NSL statute, on its face and as applied through the November 2007 NSL, violates the principle of separation of powers by effectively transferring to the executive branch the final authority to determine whether speech should or should not be suppressed.

55.    The NSL statute, on its face and as applied through the November 2007 NSL, violates the First and Fifth Amendments by requiring courts that review non-disclosure orders and challenges to NSLs to close hearings and seal judicial documents even where there is no compelling need for secrecy.

56.     The NSL statute, on its face and as applied through the November 2007 NSL, violates the First and Fifth Amendments by requiring courts that review non-disclosure orders and challenges to NSLs to review government filings *ex parte* and *in camera* upon the government's request.

57.     The gag order imposed by the November 2007 NSL is unlawful because it fails to certify the specific harm that may result from disclosure.

58.     The November 2007 NSL is unlawful because the Archive is not an electronic communication service provider.

## PRAYER FOR RELIEF

WHEREFORE Plaintiffs respectfully request that the Court:

1.     Declare that 18 U.S.C. §§ 2709(c) and 3511(b) violate the First Amendment and the principle of separation of powers.

2.     Declare that 18 U.S.C. §§ 3511(d) and 3511(e) violate the First and Fifth Amendments.

3.     Declare that 18 U.S.C. §§ 2709(c) and 3511(b) are not severable from the remainder of the NSL statute.

4.     Declare that the November 2007 NSL is unconstitutional under the First and Fifth Amendments and under the principle of separation of powers.

5.     Permanently enjoin the defendants from seeking to enforce the November 2007 NSL or from penalizing plaintiffs for failing to comply with it.

6.     Permanently enjoin the defendants from using the NSL statute against the plaintiffs or any other person or entity.

//
//
//
//

-14-

7.   Award the plaintiffs fees and costs.

8.   Grant such other and further relief as the Court deems just and proper.

Respectfully submitted,

MELISSA GOODMAN
JAMEEL JAFFER
L. DANIELLE TULLY
American Civil Liberties Union
   Foundation
National Security Project

ANN BRICK
American Civil Liberties Union
   Foundation of Northern California,
   Inc.

By: _____
        ANN BRICK
        Counsel for Plaintiffs

CINDY COHN
KURT OPSAHL
MARCIA HOFMANN
Electronic Frontier Foundation

By: _____
        MARCIA HOFMANN
        Counsel for Plaintiffs

December 14, 2007

-15-

1  MELISSA GOODMAN (NY SB # 4224333)*
   mgoodman@aclu.org
2  JAMEEL JAFFER (NY SB # 3064201)*
   jjaffer@aclu.org
3  L. DANIELLE TULLY (NY SB # 4334512)*
   dtully@aclu.org
4  American Civil Liberties Union Foundation
   125 Broad Street, 18th Floor
5  New York, NY 10004-2400
   Telephone: (212) 549-2500
6  Facsimile: (212) 549-2680

7  ANN BRICK (SB # 65296)
   abrick@aclunc.org
8  American Civil Liberties Union Foundation
     of Northern California, Inc.
9  39 Drumm Street
   San Francisco, CA 94111
10 Telephone: (415) 621-2493
   Facsimile: (415) 255-8437

   CINDY COHN (SB # 145997)
   cindy@eff.org
   KURT OPSAHL (SB # 191303)
   kurt@eff.org
   MARCIA HOFMANN (SB # 250087)
   marcia@eff.org
   Electronic Frontier Foundation
   454 Shotwell Street
   San Francisco, CA 94110
   Telephone: (415) 436-9333
   Facsimile: (415) 436-9993

11 Counsel for Petitioner
12 *Pro hac vice applications to be filed upon the assignment of this case to a judge.

13              UNITED STATES DISTRICT COURT
14        FOR THE NORTHERN DISTRICT OF CALIFORNIA
                SAN FRANCISCO DIVISION

15 INTERNET ARCHIVE; AMERICAN CIVIL        )   Case No. _____
16 LIBERTIES UNION; AMERICAN CIVIL         )
   LIBERTIES UNION FOUNDATION;             )
17 AMERICAN CIVIL LIBERTIES UNION OF       )   MEMORANDUM OF POINTS AND
   NORTHERN CALIFORNIA, INC.;              )   AUTHORITIES IN SUPPORT OF
18 AMERICAN CIVIL LIBERTIES UNION          )   PETITION OF PLAINTIFF INTERNET
   FOUNDATION OF NORTHERN                  )   ARCHIVE TO SET ASIDE NATIONAL
19 CALIFORNIA, INC.; and ELECTRONIC        )   SECURITY LETTER
20 FRONTIER FOUNDATION,                    )
                          Plaintiffs,      )   DOCUMENT SUBMITTED UNDER
21                  v.                     )   SEAL
                                           )
22 MICHAEL B. MUKASEY, in his official     )
   capacity as Attorney General of the United )
23 States; ROBERT S. MUELLER III, in his   )
   official capacity as Director of the Federal )
24 Bureau of Investigation; and ARTHUR M.  )
   CUMMINGS II, in his official capacity as )
25 Deputy Assistant Director of the        )
   Counterterrorism Division of the Federal Bureau )
26 of Investigation,                       )
27                          Defendants.    )
                                           )
28 _____

ORIGINAL FILED

07 DEC 14 PM 12: 19
RICHARD W. WIEKING
CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

SEALED BY COURT ORDER

CW

1

**TABLE OF CONTENTS**

2

TABLE OF AUTHORITIES ..................................................................................................... ii

3

4

INTRODUCTION ...................................................................................................................... 1

5

STATEMENT OF FACTS ......................................................................................................... 2

6

    A.  The Internet Archive. ................................................................................................... 2

7

    B.  The November 2007 National Security Letter. ............................................................ 3

8

ARGUMENT ..............................................................................................................................

9

I.     THE NOVEMBER 2007 NSL IS NOT AUTHORIZED BY 18 U.S.C. § 2709 ............. 6

10

    A.  The Archive Is A User, Not A Provider of An Electronic Communication

11

        Service.......................................................................................................................... 6

12

    B.  In Allowing Patrons ████████████████████████ the Archive Is

13

        Providing Storage and Preservation Services and Therefore Is Not an ECS

        Provider ....................................................................................................................... 9

14

II.    THE ARCHIVE IS NOT SUBJECT TO THE NOVEMBER 2007 NSL

15

     BECAUSE IT IS A LIBRARY PURSUANT TO 18 U.S.C. § 2709(F) ....................... 11

16

III.   THE NOVEMBER 2007 NSL IS UNCONSTITUTIONAL BECAUSE IT

17

     VIOLATES THE FIRST AMENDMENT ................................................................... 12

18

CONCLUSION ........................................................................................................................ 13

19

20

21

22

23

24

25

26

27

28

1

## TABLE OF AUTHORITIES

2

### FEDERAL CASES

3   *Crowley v. Cybersource Corp.*, 166 F.Supp.2d 1263 (N.D. Cal. 2001)...........................................7

4   *Doe v. Gonzales*, 500 F.Supp.2d 379 (S.D.N.Y. 2007), *appeal pending* ..........................1, 10, 12

5   *In re Doubleclick Privacy Litigation*, 154 F.Supp.2d 497 (S.D.N.Y. 2001)...............................7, 8

6   *Dyer v. Northwest Airlines Corporations*, 334 F.Supp.2d 1196 (D.N.D. 2004)...........................7

7   *In re Broadcast.com, Inc.*, 2001 WL 36050382 (E.D. Tex. 2001).................................................7

8   *In re JetBlue Airways Corp. Privacy Litigation*, 379 F.Supp.2d 299 (E.D.N.Y. 2005)..............7, 8

9   *Konop v. Hawaiian Airlines, Inc.*, 302 F.3d 868 (9th Cir. 2002).................................................11

10  *Quon v. Arch Wireless Operating Company, Inc.*, 445 F.Supp.2d 1116 (C.D. Cal.

11  2006) ...........................................................................................................................9, 10, 11

12  *United States v. Mullins*, 992 F.2d 1472 (9th Cir. 1993)..............................................................8

13  *United States v. Steiger*, 318 F.3d 1039 (11th Cir. 2003) ...........................................................10

14  *United States. v. Jackson*, 2007 WL 3230140 (D.D.C. 2007)......................................................10

15

### FEDERAL STATUTES

16  18 U.S.C. § 2510 .....................................................................................................................6, 11

17  18 U.S.C. § 2709 ..................................................................................................................*passim*

18  18 U.S.C. § 2711 .........................................................................................................................6

19  18 U.S.C. § 3511 ....................................................................................................................1, 12

20  20 U.S.C. § 9122 ....................................................................................................................9, 11

21

### MISCELLANEOUS

22  Orin S. Kerr, *A User's Guide to the Stored Communications Act—and a Legislator's

23  Guide to Amending It*, 72 Geo.Wash.L.Rev. 1208 (2004) ............................................................9

24  S. Rpt. No. 99-541 (1986) .............................................................................................................9

25  U.S. Dep't of Justice, Criminal Division, Computer Crime and Intellectual Property

26  Section, *Searching and Seizing Computers and Obtaining Electronic Evidence in

27  Criminal Investigations* (July 2002)..............................................................................................9

28

1

**INTRODUCTION**

2          On November 26, 2007, an agent of the Federal Bureau of Investigation ("FBI") served a

3   National Security Letter ("NSL") pursuant to 18 U.S.C. § 2709 on petitioner Internet Archive

4   ("Archive"), demanding that it turn over records about one of its patrons.  An NSL is akin to an

5   administrative subpoena.  Through NSLs, the FBI can demand records from an electronic

6   communication service provider so long as the FBI certifies that the information sought is relevant

7   to a counter-terrorism or counter-intelligence investigation.  *See* 18 U.S.C. § 2709(a)-(b).  The

8   NSL statute also permits the FBI to impose broad and effectively permanent gag orders on an NSL

9   recipient. *See* 18 U.S.C. § 2709(c).  Where the FBI certifies that certain harms may result from

10  disclosure, *see* 18 U.S.C. § 2709(c), the recipient is prohibited from disclosing that the FBI has

11  sought or obtained information. *Id.*  The NSL served on the Archive ("November 2007 NSL")

12  demanded that it disclose the subscriber name, address, length of service, and electronic

13  communication transactional records related to █████████████████████████

14  ████████████ the Archive's services.   It also imposed a gag order on the Archive, its

15  officers, its employees, and its agents.

16          As authorized by 18 U.S.C. § 3511(a), the Archive asks this Court to issue an order setting

17  aside the NSL on the ground that the demand for records is unlawful for several reasons.  First,

18  section 2709 only authorizes the issuance of an NSL to an electronic communication service

19  provider.  But the Archive is not such a provider for two reasons: (1) in permitting patrons to

20  upload materials to the site, the Archive is not acting as a *provider* of an electronic communication

21  service; and (2) the Archive is a library which, pursuant to 18 U.S.C. § 2709(f), is not a provider of

22  electronic communication services.  Second, the provision governing the gag order in the

23  November 2007 NSL, 18 U.S.C. § 2709(c), is unconstitutional on its face.  Since that provision is

24  not severable from the remainder of the statute, the entire NSL statute is unconstitutional, as one

25  court has already concluded. *See Doe v. Gonzales*, 500 F. Supp. 2d 379 (S.D.N.Y. 2007), *appeal

26  pending*.  Because the November 2007 NSL was issued under a facially unconstitutional statute, it

27  is unlawful.

28

---

1

## STATEMENT OF FACTS

2     **A.**    **The Internet Archive**

3          The Internet Archive is a digital library established in San Francisco, California in 1996.

4     Declaration of Brewster Kahle ("Kahle Decl.") ¶ 4; Internet Archive, About IA,

5     http://www.archive.org/about/about.php (last visited Dec. 13, 2007), attached to Kahle Decl. as Ex.

6     A. Its overarching mission is to help provide universal access to all knowledge. *Id.* ¶ 5.  To fulfill

7     that mission, the Archive works with national libraries, museums, universities, and the general

8     public to collect and offer free access to a wide variety of materials in digital format. *Id.* ¶ 6.

9     Some of its partners include the Library of Congress, the National Archives, and the British

10    Library. *Id.* ¶ 9.  The State of California has formally recognized the Archive as a library for the

11    purposes of the 1996 Library Services and Technology Act, 20 U.S.C. § 9122(1)(E). *Id.* ¶ 10 and

12    Ex. B.  The Archive has been a member of the American Library Association since 2000. *Id.* ¶ 10.

13          One of the unique features of the Archive is the "Wayback Machine," which allows people

14    to visit archived versions of websites.  Visitors to the Wayback Machine can type in a URL, select

15    a date, and then begin surfing on an archived version of the Web.  Kahle Decl. ¶ 11.  The Archive

16    has created and maintained the Wayback Machine by collecting snapshots of billions of public web

17    pages, except those that have opted not to be archived, every two months for the last ten years. *Id.*

18          In addition to preserving an archival copy of the Web, the Archive is dedicated to

19    preserving digital copies of other sources of knowledge and culture.  The Archive has digitized

20    archival and education movies since 1999.  Kahle Decl. ¶ 8.  It also has been involved in several

21    book digitization projects in collaboration with other institutions. *Id.* ¶ 9.  In 2005, the Archive

22    formed the Open Content Alliance to build a joint collection of digitized public domain books. *Id.*

23    The Archive's book collection currently contains over 200,000 volumes from over 70 contributing

24    libraries. *Id.*  In fact, the Archive's holdings contain more material than 95% of the world's

25    libraries. *Id.*  All of these materials are available to patrons through the Archive's website.  To

26    ensure continued access to this material, the Archive provides storage and preservation services for

27    its extensive digital collections. *Id.* ¶ 6; *Id.* Ex. A.

28

1    The Archive also accepts donated material that belongs in a library from individual patrons,

2  including audio and video recordings. Kahle Decl. ¶ 6.  Thus, members of the public directly

3  contribute resources to the Archive's digital collection. Kahle Decl. ¶ 12.  To ensure continued

4  access to this material, as with other portions of its collection, the Archive provides permanent,

5  archival storage and preservation services for these recordings and other materials donated by the

6  public. *Id.* ██████████████████████████████████

7    As a library, the Archive actively works to serve its patrons as a resource for exploration,

8  research, and learning. Kahle Decl. ¶ 13.  Providing a safe environment for a patron's activities

9  has long been an important function of libraries with physical materials.  The Archive seeks to

10  continue this practice for those patrons accessing its website. *Id.*  An individual wishing to view

11  digital materials on the Archive's website may do so as an "anonymous user"—that is to say,

12  without logging in to the website. *Id.*  However, individuals seeking to upload materials, post

13  reviews, or communicate on message boards must first register with the Archive, which includes

14  agreeing to the Archive's "Terms of Use," providing a "valid" (although unverified) e-mail

15  address, creating a password, and supplying a screen name. *Id.*  They must then log in to their

16  accounts. *Id.*  While the Archive intentionally limits the information that it collects and retains

17  from users, from time to time it may possess some information about its patrons. *Id.* ¶ 14.  Such

18  records may include the date the patron's account was opened, the screen names associated with the

19  patron's account, an unconfirmed e-mail address associated with the patron, and messages of those

20  who communicate with the Archive via e-mail. *Id.*

21    **B.    The November 2007 National Security Letter**

22    Many U.S. Attorneys and other law enforcement officials find the Archive a valuable

23  resource, and the Archive has regularly received requests for information about its collections,

24  most frequently for information stored in the Wayback Machine. Kahle Decl. ¶ 15.  The Archive

25  regularly interacts with the federal government, including the Department of Justice, the FBI, and

26  the Central Intelligence Agency and has complied with lawful subpoenas requesting information.

27  *Id.*

28

-3-

1    In June 2007, Special Agent Scott Rakowitz and Supervisory Special Agent Chuck

2    Esposito of the San Francisco office of the FBI met with attorneys at the Electronic Frontier

3    Foundation ("EFF"), who provide legal representation to the Archive for various purposes.

4    Declaration of Kurt Opsahl ("Opsahl Decl.") ¶ 4.  At that meeting, EFF agreed that it would accept

5    service of any future legal process from the FBI on behalf of the Archive.  *Id.*

6    On Monday, November 26, 2007, Supervising Special Agent ████████ left a voicemail

7    message for Kurt Opsahl, Senior Staff Attorney at EFF.  Opsahl Decl. ¶ 5.  Similar messages were

8    left with Senior Staff Attorney Lee Tien and Staff Attorney Kevin Bankston.  *Id.*  The messages

9    informed them that an FBI agent would be coming to EFF's office that day.  *Id.*  Later that

10   morning, Special Agent ████████ arrived at EFF's office, met with Bankston, and served an

11   NSL addressed to the Archive, dated November 19, 2007 ("November 2007 NSL").  *Id.* ¶ 6 and

12   Ex. A to Opsahl Decl.  The November 2007 NSL was signed by defendant Arthur M. Cummings,

13   II, Deputy Assistant Director of the Counterterrorism Division of the FBI.  Opsahl Decl., Ex. A.

14   The November 2007 NSL directs the Archive "to provide the [FBI] the subscriber's name,

15   address, length of service, and electronic communication transactional records" pertaining to a

16   particular ████████████████████  *Id.*  It covers the period ████████

17   ████████  *Id.*  Parroting the language of the NSL statute's non-disclosure certification

18   provision, 18 U.S.C. §2709(c), the November 2007 NSL includes the following certification:

19       disclosure of the fact that the FBI has sought or obtained access to the information
         sought by this letter may endanger the national security of the United States,
20       interfere with a criminal, counterterrorism, or counterintelligence investigation,
         interfere with diplomatic relations, or endanger the life or physical safety of a
21       person.

22   *Id.*  The certification does not specify which of these harms may result from disclosure.  *Id.*  The

23   November 2007 NSL further advises the Archive that the NSL statute "prohibits you, or any

24   officer, employee, or agent of yours, from disclosing this letter, other than to those to whom

25   disclosure is necessary to comply with the letter or to an attorney to obtain legal advice or legal

26   assistance with respect to this letter."  *Id.*

27

28

-4-

1    Appended to the November 2007 NSL is a page titled "ATTACHMENT" that states, "In
2    preparing your response to this National Security Letter, you should determine whether your
3    company maintains the following types of information which may be considered by you to be an
4    electronic communications transactional record in accordance with Title 18 United States Code
5    Section 2709." Opsahl Decl., Ex. A. The page lists, among other things, ███████████
6    ███████████████████████████████████████████████████████████
7    ████████████████████████ and "[a]ny other information which you consider to be an
8    electronic communication transactional record." *Id.* The November 2007 NSL requires that the
9    Archive provide the requested information "personally to a representative of the FBI ████████
10   ████ or through use of delivery service or through secure fax" by December 14, 2007 (14
11   business days from receipt of the letter). *Id.*

12   On Tuesday, November 27, 2007, Opsahl and EFF Staff Attorney Marcia Hofmann brought
13   the November 2007 NSL to the Archive and showed it to Brewster Kahle, who is the Chair of the
14   Archive's Board of Directors as well as one of its Digital Librarians. Kahle Decl. ¶ 18; Opsahl
15   Decl. ¶ 8.

16   On Wednesday, November 28, 2007, Special Agent ████████ left a message for Bankston
17   inquiring about the status of the Archive's response. Opsahl Decl. ¶ 11. Later that day, Opsahl
18   spoke with Special Agent ██████ on the telephone and informed him that the Archive was
19   reviewing and considering the letter and notified him, pursuant to section 2709(c)(4), that the
20   Archive would be bringing in additional counsel. *Id.* ¶ 12.

21   The NSL statute and the November 2007 NSL have prevented the Archive from disclosing
22   information about the November 2007 NSL and this lawsuit to the Archive's board of directors, to
23   its staff, to its patrons, to other libraries, to the press, to members of the public, and to members of
24   Congress. They likewise have prevented the Archive from making it known that it is speaking
25   from experience in publicly advocating for legislative change with respect to the NSL demand and
26   gag power. Kahle Decl. ¶ 21.

27
28

-5-

1                                        **ARGUMENT**

2     I.     **THE NOVEMBER 2007 NSL IS NOT AUTHORIZED BY 18 U.S.C. § 2709**

3             The Stored Communications Act ("SCA"), 18 U.S.C. §§ 2701-2712, which was enacted as

4    Title II of the Electronic Communications Privacy Act ("ECPA"), regulates the government's

5    access to stored information maintained by network service providers. Section 2709, which is part

6    of the SCA, governs the FBI's issuance of an NSL. Section 2709(a) provides in pertinent part:

7
8
9
> **Duty to provide.**—A wire or electronic communication service provider shall comply with a request for subscriber information and toll billing records information, or electronic communication transactional records in its custody or possession made by the Director of the Federal Bureau of Investigation under subsection (b) of this section.

10

11            By its terms, section 2709 permits the issuance of an NSL only to a wire or electronic

12    communication service ("ECS") provider.[1] The Internet Archive, however, is not an ECS provider

13    and hence may not be required to comply with the November 2007 NSL. First, in configuring its

14    site so that patrons can contribute materials by uploading them to the site, the Archive is only a

15    user, not a provider of an ECS. Second, the activity at issue under the November 2007 NSL –

16    permitting patrons ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ part of the Archive ▮▮▮▮▮▮▮

17    ▮▮▮▮▮▮ – is not the provision of an electronic communication service; rather, it is providing

18    storage and preservation services, more akin to providing remote computing storage. The NSL

19    must therefore be set aside.

20     A.    **The Archive Is A User, Not A Provider of An Electronic Communication**
21           **Service**

22            The SCA defines "electronic communication service" as "any service which provides to

23    users thereof the ability to send or receive wire or electronic communications." 18 U.S.C. §

24    2510(15). The issue here, however, is not whether electronic communications are being sent and

25

26    ———————————
[1] The reference to a "wire" communication service in section 2709 is redundant, since the

27    definition of an "electronic" communication service encompasses "any service which provides to users thereof the ability to send or receive *wire* or electronic communications." 18 U.S.C. §

28    2510(15) (emphasis added) (incorporated by reference into the SCA at 18 U.S.C. § 2711).

1    received between the Archive and its patrons. They plainly are. The issue is whether the Archive

2    actually *provides* the service that allows the communications to be sent and received or whether, as

3    the case law discussed below makes clear, the Archive, like its patrons, is simply a user of that

4    service.

5         Allowing those who visit a website to provide information to it does not make that website

6    a *provider* of an ECS. This is true whether a visitor is providing information to the site in order to

7    complete a purchase, *see Crowley v. Cybersource Corp.*, 166 F. Supp. 2d 1263 (N.D. Cal. 2001), or

8    is providing information in connection with downloading streaming "visual programming," *see In*

9    *re Broadcast.com, Inc.*, 2001 WL 36050382 (E.D. Tex. 2001), or is making online airline

10   reservations, *see In re JetBlue Airways Corp. Privacy Litigation*, 379 F. Supp. 2d 299 (E.D.N.Y.

11   2005), or is ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ the Internet Archive. To the contrary, both the

12   website in question and the person or entity communicating with the site are *users* of an ECS.

13   Here, as in the cases cited above, the entity that enables the communications to take place is the

14   Internet access provider used by the Archive or the visitor to the Archive website. Those access

15   providers are the ECS providers. *See In re Doubleclick Privacy Litigation*, 154 F. Supp. 2d 497,

16   508 (S.D.N.Y. 2001) ("the 'service which provides to users thereof the ability to send or receive

17   wire or electronic communications' is 'Internet access.'"); *In re Broadcast.com, Inc.*, 2001 WL

18   36050382 at *2 (same).

19        In a number of cases, website patrons have alleged that the defendant was an ECS provider

20   that had violated the SCA by unlawfully disclosing personal information provided in connection

21   with obtaining the products or services of the website. In each case, the court rejected the

22   plaintiff's claim because the website in question did not provide an electronic communication

23   service and hence was not subject to the SCA's proscription. *In re JetBlue Corp. Airways Privacy*

24   *Litigation*, 379 F. Supp. 2d 299; *Dyer v. Northwest Airlines Corporations*, 334 F. Supp. 2d 1196,

25   1199 (D.N.D. 2004) ("businesses offering their traditional products and services online through a

26   website are not providing an 'electronic communication service'"); *Crowley*, 166 F. Supp. 2d at

27   1270 (Amazon.com is not an ECS provider, it is an ECS user); *In re Broadcast.com, Inc.*, 2001 WL

28   36050382 at *2, 3 ("Broadcast.com operates a website and, in doing so, does not provide Internet

-7-

1  access to the public.  It uses it."); *see also, In re Doubleclick Privacy Litigation,* 154 F. Supp. 2d at

2  508-09 (websites are users of an ECS under ECPA for purposes of determining applicability of

3  exception to prohibition against obtaining access to an electronic communication).  As the court in

4  *In re JetBlue Corp. Airways Privacy Litigation* explained:

> Although JetBlue operates a website that receives and transmits data to and from
> its customers, it is undisputed that it is not the provider of the electronic
> communication service that allows such data to be transmitted over the Internet.
> Rather, JetBlue is more appropriately characterized as a provider of air travel
> services and a consumer of electronic communication services.  The website that
> it operates, like a telephone, enables the company to communicate with its
> customers in the regular course of business.  Mere operation of the website,
> however, does not transform JetBlue into a provider of internet access, just as the
> use of a telephone to accept telephone reservations does not transform the
> company into a provider of telephone service.  Thus, a company such as JetBlue
> does not become an "electronic communication service" provider simply because
> it maintains a website that allows for the transmission of electronic
> communications between itself and its customers."

13  *In re JetBlue Corp. Privacy Litigation,* 379 F. Supp. 2d at 307 (fn. omitted). [2]

14      The Archive is no more an ECS provider than were the websites in the cases cited above.

15  Like those websites, the Archive is a user of the Internet so that it may, for example, ▮▮▮▮ .

16  ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ the Archive's collection.  Its

17  purpose is not to provide basic connectivity, *i.e.,* access to an electronic communications service

18  to third parties.  Its purpose is to act as a repository of information and knowledge, stored in

19  digital form, so that knowledge and information may be preserved and made available to those

20  seeking it, now and for generations to come.  Because the Archive is not an ECS provider, the

21  Archive falls outside the parameters of section 2709(a) and hence the NSL at issue here must be

22  set aside as unlawful.

---

[2] The Archive's public Internet website stands in stark contrast to the elaborate, internal American
Airlines computerized customer reservation system, known as SABRE, that was at issue in *United
States v. Mullins,* 992 F.2d 1472 (9th Cir. 1993).  In *Mullins,* the defendant travel agents used the
system, access to which they leased from American, to defraud the airline by stealing frequent flyer
miles.  *Id.* at 1474-75.  In upholding the constitutionality of the manner in which evidence against
the defendants was obtained from SABRE, the Ninth Circuit assumed, without analysis, that
American was a provider of a wire or electronic communications service with respect to the
system.  *Id.* at 1478.  The court's conclusion, with respect to a private, internal system, access to
which was leased to others, in no way contradicts the conclusions of the decisions cited in the text.

B.  **In Allowing Patrons** ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ **the Archive Is Providing Storage and Preservation Services and Therefore Is Not an ECS Provider**

The SCA regulates the activities of providers of an "electronic communication service" and those of a "remote computing service" ("RCS").[3]  Section 2709 applies only to ECS providers, however, not to RCS providers, nor to entities that are neither an ECS nor an RCS provider.  In determining whether an entity is an ECS provider, an RCS provider, or neither, the court must examine the nature of the activity in question in order to ascertain whether the statute applies.  That is because an entity may be an electronic communication service provider with respect to some activities but not with respect to others.  As the Department of Justice itself recognizes:

> Whether an entity is a provider of an "electronic communication service," or a provider of "remote computing service," or neither depends on the nature of the particular communication sought [by the government].  For example, a single provider can simultaneously provide "electronic communications service" with respect to one communication and "remote computing service" with respect to another communication.

U.S. Dep't of Justice, Criminal Division, Computer Crime and Intellectual Property Section, *Searching and Seizing Computers and Obtaining Electronic Evidence in Criminal Investigations* 88 (July 2002); *accord, Quon v. Arch Wireless Operating Company, Inc.*, 445 F. Supp. 2d 1116, 1136 (C.D. Cal. 2006) ("Congress recognized that service providers can offer a wide variety of different services, each one being characterized differently under the statute." (citing S. Rpt. No. 99-541, at 16 (1986)).  As Professor Orin Kerr explains:

> The distinction between providers of ECS and RCS is made somewhat confusing by the fact that most network service providers are multifunctional. . . . The classifications of ECS and RCS are context sensitive: the key is the provider's role with respect to a particular copy of a particular communication, rather than the provider's status in the abstract.

Orin S. Kerr, *A User's Guide to the Stored Communications Act—and a Legislator's Guide to Amending It*, 72 GEO. WASH. L. REV. 1208, 1215 (2004).

---

[3]  As noted above, the Act defines "electronic communication service" as "any service which provides to users thereof the ability to send or receive wire or electronic communications." 18 U.S.C. § 2510(15).  It defines a "remote computing service" as the "provision to the public of computer storage or processing services by means of an electronic communications system." 18 U.S.C. § 2711(2).

1    The characteristics the courts rely on to distinguish an RCS from an ECS also demonstrate

2   that the storage and preservation services that the Archive provides to those who ████████████

3   ████████████ take the Archive outside the definition of an ECS. The discussion in *Quon v.*

4   *Arch Wireless Operating Co., Inc.*, 445 F. Supp. 2d 1116, is particularly useful. The court there

5   delineates three essential characteristics that distinguish storage by an ECS from storage by an

6   RCS:

7         First, "the centrality a computer plays in facilitating the communication is key to Congress'

8   definition of a remote computing service. . . . [A]t a minimum, a computer must play a central role

9   in facilitating the storage of the communication." *Id.* at 1132-33 (emphasis added). Second, the

10  fact that the material is being stored is a critical factor. *Id.* at 1134. Finally, the length and purpose

11  of the storage must be examined. When an entity provides long term storage that "is not incidental

12  to the transmission of the communication itself, and is not meant for backup protection but . . . as

13  the single place where text messages, after they have been read, are archived for a permanent

14  record-keeping mechanism," it is acting as an RCS. *Id.* at 1136; *accord United States v. Jackson*,

15  2007 WL 3230140 at *3 (D.D.C. 2007) (quoting *Quon* with approval).

16        Like the text message storage service at issue in *Quon* and *Jackson*, the service the Archive

17  provides in ████████████████████████ the public takes it outside the definition of

18  an ECS. As in *Jackson* and *Quon*, the Archive provides permanent, archival storage as part of

19  ████████████ the collection. Kahle Decl. ¶ 12. This differentiates the Archive from an ECS

20  whose electronic storage of communications is either temporary, intermediate storage in

21  connection with the transmission of a communication or is for purposes of backup protection for

22  the communication. *See Quon*, 445 F. Supp. 2d at 1136. The Archive is intended as the final

23  point where the material is stored—that is, the material becomes part of the Archive's permanent

24  collection.[4]

25  ⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯
    [4]  Although the Archive provides many other services to the public, including the ability to ▁▁▁▁▁▁

26  ████████████████████████████████ and ████████████
    ████████████████ that does not change the fact that the service in question
    here—████████████████████████ is one of storage, not the provision of

27  an electronic communication service. Whether the Archive might be considered an ECS provider
    with respect to those services is a question better left for another day. *See United States v. Steiger*,

28  318 F.3d 1039, 1049 (11th Cir. 2003) (equating, in dictum, an electronic bulletin board system with

-10-

1    The FBI cannot obtain from the Archive the particular records it seeks using an NSL issued

2    under 18 U.S.C. 2709(a) because the Archive is not an electronic communication service provider

3    for purposes of maintaining the records sought.

4    **II.    THE ARCHIVE IS NOT SUBJECT TO THE NOVEMBER 2007 NSL BECAUSE IT**

5    **IS A LIBRARY PURSUANT TO 18 U.S.C. § 2709(f)**

6    18 U.S.C. § 2709 contains an additional protection to ensure that libraries cannot be treated

7    as electronic communication service providers for providing essential library services to the public.

8    Specifically, the statute provides:

9    A library (as that term is defined in section 213(1) of the Library Services and
10   Technology Act (20 U.S.C. § 9122(1)), the services of which include access to the
     Internet, books, journals, magazines, newspapers, or other similar forms of
11   communication in print or digitally by patrons for their use, review, examination,
     or circulation, is not a wire or electronic communication service provider for
12   purposes of this section, unless the library is providing the services defined in
     section 2510(15) ("electronic communication service") of this title.
13

14   18 U.S.C. § 2709(f).

15   In turn, the 1996 Library Services and Technology Act defines a "library" as including,

16   *inter alia,* "a private library or other special library, but only if the State in which such private or

17   special library is located determines that the library should be considered a library for purposes of

18   this subchapter." 20 U.S.C. § 9122(1)(E). The Archive has been formally recognized as a library

19   by the State of California for purposes of the 1996 Library Services and Technology Act, and thus

20   satisfies this definition. Kahle Decl., Ex. B. The Archive is therefore the type of library to which

21   18 U.S.C. § 2709(f) applies, and cannot be considered a wire or electronic communication service

22   provider under 18 U.S.C. § 2709(f) unless it provides an "electronic communication service" under

23   18 U.S.C. § 2510(15).

24

25   a telephone company or an ISP); *Konop v. Hawaiian Airlines,* Inc., 302 F.3d 868, 879-80 (9th Cir.
     2002) (accepting the parties' assumption that host of Web-based message board was an electronic
26   communication service provider).

27   *See Quon,* 445 F. Supp. 2d at 1136-37 (A single entity can offer differing services and
     whether it is treated as an ECS or an RCS with respect to that service depends on the nature of the
28   service in question).

-11-

1      As explained above, the Archive does not provide an "electronic communication service"

2  with respect to the ███████████ It provides access to those ███████████ "patrons for their

3  use review, examination or circulation," 18 U.S.C. § 2709(f). Thus, 18 U.S.C. § 2709(f) provides

4  an additional reason why the Court should not classify the Archive as a provider of electronic

5  communication services subject to demands for records under 18 U.S.C. § 2709(a), and the Court

6  must therefore set aside the November 2007 NSL.

7  **III.    THE NOVEMBER 2007 NSL IS UNCONSTITUTIONAL BECAUSE IT VIOLATES THE FIRST AMENDMENT**

8

9      The November 2007 NSL must also be set aside because the statutory authority under

10  which it was issued is unconstitutional on its face. The gag order provision in section 2709(c)

11  violates the First Amendment and cannot be severed from the remainder of the statute. That

12  renders 18 U.S.C. § 2709 unenforceable in its entirety. Notably, the one court that has already

13  considered the constitutionality of the NSL statute concluded that the statute's gag provisions

14  violate the First Amendment and that because those gag provisions are not severable, the entire

15  statute is unconstitutional. *Doe v. Gonzales*, 500 F. Supp. 2d 379 (S.D.N.Y. 2007), *appeal*

16  *pending*. The *Doe* court enjoined the FBI from issuing NSLs under 18 U.S.C. § 2709, but that

17  ruling is stayed pending appeal. That the November 2007 NSL was issued under a facially

18  unconstitutional statute provides yet another reason that the NSL should be set aside.

19      The Court need not, however, decide the question of the facial constitutionality of the NSL

20  statute's gag provisions in the context of this petition. That issue will be briefed in connection with

21  the motion for summary judgment that plaintiffs will be filing in this case, challenging the facial

22  and as-applied constitutionality of 18 U.S.C. § 2709 and of § 3511, which sets forth the procedures

23  and standards governing a challenge to a section 2709(c) a gag order. Accordingly, petitioner's

24  constitutional argument can, most appropriately, be fully explicated in the context of that action.

25  //

26  //

27  //

28

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF PETITION
TO SET ASIDE NATIONAL SECURITY LETTER

1

**CONCLUSION**

2          For the foregoing reasons, the Archive requests that this Court issue an order setting aside

3     the November 2007 NSL.

4

5                                                    Respectfully submitted,

6                                                    MELISSA GOODMAN
7                                                    JAMBEL JAFFER
                                                     L. DANIELLE TULLY
8                                                    American Civil Liberties Union Foundation
                                                     National Security Project

9                                                    ANN BRICK
                                                     American Civil Liberties Union
10                                                   Foundation of Northern California, Inc.

11                                             By: _____
                                                     ANN BRICK
12                                                   Counsel for Petitioner

13                                                   CINDY COHN
                                                     KURT OPSAHL
14                                                   MARCIA HOFMANN
                                                     Electronic Frontier Foundation

15                                             By: _____
                                                     MARCIA HOFMANN
16    DATED: December 14, 2007                       Counsel for Petitioner

17

18

19

20

21

22

23

24

25

26

27

28

-13-

1  MELISSA GOODMAN (NY SB # 4224333)*
   mgoodman@aclu.org
2  JAMEEL JAFFER (NY SB # 3064201)*
   jjaffer@aclu.org
3  L. DANIELLE TULLY (NY SB # 4334512)*
   dtully@aclu.org
4  American Civil Liberties Union Foundation
   125 Broad Street, 18th Floor
5  New York, NY 10004-2400
   Telephone: (212) 549-2500
6  Facsimile: (212) 549-2680

7  ANN BRICK (SB # 65296)
   abrick@aclunc.org
8  American Civil Liberties Union Foundation
      of Northern California, Inc.
9  39 Drumm Street
   San Francisco, CA 94111
10 Telephone: (415) 621-2493
   Facsimile: (415) 255-8437

11 Counsel for Petitioner

CINDY COHN (SB # 145997)
cindy@eff.org
KURT OPSAHL (SB # 191303)
kurt@eff.org
MARCIA HOFMANN (SB # 250087)
marcia@eff.org
Electronic Frontier Foundation
454 Shotwell Street
San Francisco, CA 94110
Telephone: (415) 436-9333
Facsimile: (415) 436-9993

**SEALED BY COURT ORDER**

**ORIGINAL FILED**
07 DEC 14  PH 12: 19
RICHARD W. WIEKING
CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

12 *Pro hac vice applications to be filed upon the assignment of this case to a judge.

13              UNITED STATES DISTRICT COURT
14         FOR THE NORTHERN DISTRICT OF CALIFORNIA
                 SAN FRANCISCO DIVISION                    **CW**

15 INTERNET ARCHIVE; AMERICAN CIVIL        Case No._____  6 9 4 6
16 LIBERTIES UNION; AMERICAN CIVIL
   LIBERTIES UNION FOUNDATION;
17 AMERICAN CIVIL LIBERTIES UNION OF       **DECLARATION OF KURT OPSAHL IN**
   NORTHERN CALIFORNIA, INC.;             **SUPPORT OF PETITION TO SET ASIDE**
18 AMERICAN CIVIL LIBERTIES UNION          **NATIONAL SECURITY LETTER**
   FOUNDATION OF NORTHERN
19 CALIFORNIA, INC.; and ELECTRONIC        **DOCUMENT SUBMITTED UNDER**
20 FRONTIER FOUNDATION,                    **SEAL**
                              Plaintiffs,
21          v.
22 MICHAEL B. MUKASEY, in his official
   capacity as Attorney General of the United
23 States; ROBERT S. MUELLER III, in his
   official capacity as Director of the Federal
24 Bureau of Investigation; and ARTHUR M.
   CUMMINGS II, in his official capacity as
25 Deputy Assistant Director of the
   Counterterrorism Division of the Federal Bureau
26 of Investigation,
                              Defendants.
27
28

DECLARATION OF KURT OPSHAL

I, Kurt Opsahl, declare as follows:

1.     I am a Senior Staff Attorney at the Electronic Frontier Foundation ("EFF"), and a member in good standing of the California State Bar, and am admitted to practice before this Court. Except as otherwise indicated, I have personal knowledge of the matters stated in this declaration and, if called upon to do so, am competent to testify to all matters set forth herein.

2.     EFF is a non-profit civil liberties organization working to protect rights in the digital world. EFF actively encourages and challenges industry and government to support free expression and privacy in the information society. Founded in 1990, EFF is based in San Francisco.

3.     I, along with other attorneys at EFF, represent the Internet Archive ("the Archive") on various legal matters.

4.     In June of 2007, Special Agent Scott Rakowitz of the San Francisco office of the Federal Bureau of Investigation scheduled a liaison meeting with our office because of our role as counsel to the Archive.  The meeting took place in July of 2007 at the EFF office, with Special Agent Rakowitz and Supervisory Special Agent Chuck Esposito.  As I recall, the meeting also included my colleagues Staff Attorney Kevin Bankston and Legal Director Cindy Cohn.  No employee of the Archive was present.  At that we meeting, we agreed that EFF would accept service on behalf of the Archive of legal process from the United States.  We also discussed the Archive generally, providing an overview of the Archive's operation and how little information the Archive maintains.

5.     On Monday, November 26, 2007, I received a voicemail message from Supervisory Special Agent ▇▇▇▇▇  I am informed and believe that similar messages were left with my colleagues Senior Staff Attorney Lee Tien and Kevin Bankston.  The messages informed us that an FBI agent would be coming by our office that day.  I am informed and believe that my colleague Kevin Bankston returned the message and spoke with Supervisory Special Agent ▇▇▇▇▇ learning that an FBI special agent would be serving a National Security Letter at our offices.

6.     Later that morning, Special Agent ▇▇▇▇▇▇▇ arrived at our office and met with Mr. Bankston.  At that time, Special Agent ▇▇▇ served a National Security Letter ("NSL") on Mr. Bankston as a representative of the Archive.

-1-
DECLARATION OF KURT OPSAHL

1    7.    The NSL, dated November 19, 2007, is printed on FBI letterhead and signed by

2    Arthur M. Cummings II, Deputy Assistant Director Counterterrorism Division.

3    8.    On Tuesday, November 27, 2007, I brought the November 2007 NSL to the Archive

4    and showed it to Brewster Kahle, Chairman of the Board of Directors as well as one of its Digital

5    Librarians. Marcia Hoffman, another EFF staff attorney, also attended that meeting.

6    9.    The NSL directed the Archive to provide information about one of its patrons.

7    Specifically, the NSL states that the Archive is "hereby directed to provide the [FBI] the

8    subscriber's name, address, length of service, and electronic communication transactional records,

9    to include existing transaction/activity logs and all electronic mail (e-mail) header information (not

10   to include message content and/or subject fields)" pertaining to

11   ███████████████████████████████    The NSL also includes a certification that

12   "the information sought is relevant to an authorized investigation to protect against international

13   terrorism or clandestine intelligence activities."

14   10.    Attached hereto as Exhibit A is a true and correct copy of the NSL.

15   11.    I am informed and believe that on Wednesday, November 28, 2007, Special Agent

16   ██████ left a message for Mr. Bankston inquiring about the status of the Archive's response.

17   12.    Later that day, I spoke with Special Agent ██████ on the telephone and informed

18   him (1) that pursuant to Section 2709(c)(4), the Archive would be bringing in additional counsel;

19   and (2) that the Archive was reviewing and considering the NSL

20   I declare under penalty of perjury under the laws of the State of California that the

21   foregoing is true and correct and that this document was executed in San Francisco, California.

22

23   DATED: December 7, 2007

24                                                    By

25                                                         Kurt Opsahl

26

27

28

-2-
DECLARATION OF KURT OPSAHL

# EXHIBIT A



U.S. Department of Justice

Federal Bureau of Investigation

935 Pennsylvania Ave., N.W.
Washington, D.C. 20535

November 19, 2007

Internet Archive
116 Sheridan Avenue
San Francisco, California

To whom it may concern:

Under the authority of Executive Order 12333, dated December 4, 1981, and pursuant to Title 18, United States Code (U.S.C.), Section 2709 (Section 201 of the Electronic Communications Privacy Act of 1986) (as amended, October 26, 2001), you are hereby directed to provide to the Federal Bureau of Investigation (FBI) the subscriber's name, address, length of service, and electronic communication transactional records, to include existing transaction/activity logs and all electronic mail (e-mail) header information (not to include message content and/or subject fields), for the below-listed address holders:



Please see the attachment following this letter for the types of information that you might consider to be a electronic communications transactional record. We are not directing that you should provide, and you should not provide, information pursuant to this letter that would disclose the content of any electronic communication. Title 18, U.S.C., Section 2510(8) defines content as "any information concerning the substance, purport, or meaning of" a communication. Subject lines of e-mails and message content are content information and should not be provided pursuant to this letter.

If the time period noted above is to the "present," that term is intended to direct production of information to the date of the processing of this letter. If providing information to the date of processing is not feasible, please provide information to the date of receipt of this letter.

While fulfilling your obligations under this letter, please do not disable, suspend, lock, cancel or interrupt service to the above-described subscriber(s) or accounts. A service interruption or degradation may alert the subscriber(s)/account users(s) that investigative action is being taken. If you are not able to fulfill your obligations under this letter without alerting the subscriber/account user, please contact the FBI prior to proceeding.

In accordance with Title 18, U.S.C., Section 2709(b), I certify that the information sought is relevant to an authorized investigation to protect against international terrorism or clandestine intelligence activities, and that such an investigation of a United States person is not conducted solely on the basis of activities protected by the First Amendment to the Constitution of the United States.

In accordance with 18 U.S.C. § 2709(c)(1), I certify that a disclosure of the fact that the FBI has sought or obtained access to the information sought by this letter may endanger the national security of the United States, interfere with a criminal, counterterrorism, or counterintelligence investigation, interfere with diplomatic relations, or endanger the life or physical safety of a person. Accordingly, 18 U.S.C. § 2709(c)(1) and (2) prohibits you, or any officer, employee, or agent of yours, from disclosing this letter, other than to those to whom disclosure is necessary to comply with the letter or to an attorney to obtain legal advice or legal assistance with respect to this letter.

In accordance with 18 U.S.C. § 2709(c)(3), you are directed to notify any persons to whom you have disclosed this letter that they are also subject to the nondisclosure requirement and are therefore also prohibited from disclosing the letter to anyone else.

In accordance with 18 U.S.C. § 2709(c)(4), if the FBI asks for the information, you should identify any person to whom such disclosure has been made or to whom such disclosure will be made. In no instance will you be required to identify any attorney to whom disclosure was made or will be made in order to obtain legal advice or legal assistance with respect to this letter.

In accordance with 18 U.S.C. § 3511(a) and (b)(1), you have a right to challenge this letter if compliance would be unreasonable, oppressive, or otherwise unlawful and the right to challenge the nondisclosure requirement set forth above.

In accordance with 18 U.S.C. § 3511(c), an unlawful failure to comply with this letter, including any nondisclosure requirement, may result in the United States bringing an enforcement action.

You are requested to provide records responsive to this request personally to a representative of the FBI ▮▮▮▮▮▮▮▮▮▮ or through use of a delivery service or through secure fax within fourteen (14) business days of receipt of this letter.

Any questions you have regarding this request should be directed only to the FBI ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ depending on whether the service is personal or through a delivery service. Due to security considerations, you should neither send the records through routine mail nor disclose the substance of this request in any telephone conversation.

Your cooperation in this matter is greatly appreciated.

Sincerely,

Arthur M. Cummings II
Deputy Assistant Director
Counterterrorism Division

2

## ATTACHMENT

In preparing your response to this National Security Letter, you should determine whether your company maintains the following types of information which may be considered by you to be an electronic communications transactional record in accordance with Title 18 United States Code Section 2709.



- Any other information which you consider to be an electronic communication transactional record

We are not directing that you should provide, and you should not provide, information pursuant to this letter that would disclose the content of any electronic communication as defined in Title 18 United States Code Section 2510(8). Subject lines of e-mails are content information and should not be provided pursuant to this letter. If the records provided are particularly large we request that you provide this information in electronic format preferably on a CR-ROM or DVD..

3

MELISSA GOODMAN (NY SB # 4224333)*
mgoodman@aclu.org
JAMEEL JAFFER (NY SB # 3064201)*
jjaffer@aclu.org
L. DANIELLE TULLY (NY SB # 4334512)*
dtully@aclu.org
American Civil Liberties Union Foundation
125 Broad Street, 18th Floor
New York, NY 10004-2400
Telephone: (212) 549-2500
Facsimile: (212) 549-2680

ANN BRICK (SB # 65296)
abrick@aclunc.org
American Civil Liberties Union Foundation
of Northern California, Inc.
39 Drumm Street
San Francisco, CA 94111
Telephone: (415) 621-2493
Facsimile: (415) 255-8437

CINDY COHN (SB # 145997)
cindy@eff.org
KURT OPSAHL (SB # 191303)
kurt@eff.org
MARCIA HOFMANN (SB # 250087)
marcia@eff.org
Electronic Frontier Foundation
454 Shotwell Street
San Francisco, CA 94110
Telephone: (415) 436-9333
Facsimile: (415) 436-9993

Counsel for Petitioner
*Pro hac vice applications to be filed upon the assignment of this case to a judge.

UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF CALIFORNIA
SAN FRANCISCO DIVISION

INTERNET ARCHIVE; AMERICAN CIVIL
LIBERTIES UNION; AMERICAN CIVIL
LIBERTIES UNION FOUNDATION;
AMERICAN CIVIL LIBERTIES UNION OF
NORTHERN CALIFORNIA, INC.;
AMERICAN CIVIL LIBERTIES UNION
FOUNDATION OF NORTHERN
CALIFORNIA, INC.; and ELECTRONIC
FRONTIER FOUNDATION,
                                    Plaintiffs,

        v.

MICHAEL B. MUKASEY, in his official
capacity as Attorney General of the United
States; ROBERT S. MUELLER III, in his
official capacity as Director of the Federal
Bureau of Investigation; and ARTHUR M.
CUMMINGS II, in his official capacity as
Deputy Assistant Director of the
Counterterrorism Division of the Federal Bureau
of Investigation,
                                    Defendants.

Case No. _____

DECLARATION OF BREWSTER
KAHLE IN SUPPORT OF PETITION TO
SET ASIDE NATIONAL SECURITY
LETTER

DOCUMENT SUBMITTED UNDER
SEAL

SEALED
BY COURT ORDER

1
2
3    I, Brewster Kahle, declare as follows:

4        1.      My name is Brewster Kahle and I co-founded the Internet Archive ("the Archive").

5    Currently, I serve as Chair of the organization's Board of Directors and as a Digital Librarian.

6    Except as otherwise indicated, I have personal knowledge of the matters set forth herein and, if

7    called upon to do so, could and would competently testify thereto.

8
9        2.      Before founding the Archive, I invented the WAIS (Wide Area Information Server)

10   system and, in 1992, founded WAIS Inc., an electronic publishing company sold in 1995 to AOL.

11   Before that, I served as senior engineer for Thinking Machines, a parallel supercomputer maker,

12   between 1983 and 1989. I earned a Bachelor of Science from the Massachusetts Institute of

13   Technology in 1982.

14       3.      In addition to my work at the Archive, I am co-founder, President, Chief Executive

15   Officer and Chair of the Board of Directors of Alexa Internet, now a wholly owned subsidiary of

16   Amazon.com. Alexa is a leading provider of Internet navigation and search services.

17
18                                          The Archive

19       4.      The Archive, located in San Francisco, California, is a 501(c)(3) nonprofit

20   organization established in 1996 with the purpose of offering permanent access to historical

21   collections that exist in digital format to researchers, historians, and scholars. The Archive is

22   governed by a three-member board of directors, and has more than one hundred employees.

23
24       5.      The Archive was founded to build an "Internet library," which is available to the

25   general public at http://www.archive.org. The Archive's overarching mission is to provide

26   universal access to all knowledge. Attached hereto as Exhibit A is a true and correct copy of the

27
28

1  Internet Archive web page, *About IA*, http://www.archive.org/about/about.php (last visited Dec.

2  11, 2007).

3      6.      To fulfill its mission, the Archive works with national libraries, museums,

4  universities, and the general public to collect and offer free access to materials on the Internet,

5  including texts, audio, moving images, software, and archived web pages in its collections.   To

6

7  ensure continued access, the Archive provides permanent, archival storage and preservation

8  services for this extensive digital material.

9      7.      The Archive builds and maintains its digital collection in a number of ways. It

10  receives donations to its collections from a multitude of resources, including libraries, educational

11  institutions, private companies and individuals.

12      8.      In 1999, the Archive began to digitize archival and education movies. As part of

13  this work, the Archive has digitized more than 1,900 important public domain archival films from

14  the collection of the Prelinger Archives. These films are now available to the public at no charge

15  for download on the Internet at http://www.archive.org/movies.

16

17      9.      The Archive also has worked with a number of partners to digitize books and make

18  them available online. The Archive's book collection currently contains over 200,000 volumes

19  from over 70 contributing libraries. The Archive's holdings contain more material than 95% of the

20  world's libraries. Some of the Archive's partners include the Library of Congress, National

21  Archives, and the British Library, among many others. In 2005, the Archive formed the Open

22  Content Alliance to build a joint collection of digitized public domain books.

23

24      10.      The Archive has been formally recognized as a library by the State of California.

25  Attached hereto as Exhibit B is a true and correct copy of a letter dated December 13, 2006, from

26  Susan Hildreth, State Librarian of California, to Mel Blackwell, Vice President, Schools &

27  Libraries Division, Universal Service Administrative Company. In this letter, Ms. Hildreth certifies

28

1    that the Archive is a library eligible to receive funding under the Library Services and Technology

2    Act, and also qualifies for E-Rate, a program that provides discounts to schools and libraries to

3    ensure they are able to obtain affordable telecommunications services. In addition, the Archive has

4    been a member of the American Library Association since 2000.

5

6         11.    One of the unique features of the Archive is a service known as the Wayback

7    Machine, which allows people to visit archived versions of websites. The Archive has created and

8    maintained the Wayback Machine by collecting snapshots of billions of public web pages, except

9    those that have opted not to be archived, every two months for the last ten years. Thus the

10   Wayback Machine makes it possible to surf more than 85 billion pages stored in the Internet

11   Archive's web archive. Visitors to the Wayback Machine can type in a Uniform Resource Locator

12   (URL), such as a website address, select a date, and then begin surfing on an archived version of

13
     the Web. The archived files, when retrieved by the Wayback Machine, point to other archived
14
     files, whether HTML (HyperText Markup Language, typically web pages) or images. If a visitor
15

16   clicks on a link on an archived page, the Wayback Machine will provide the archived file with the

17   closest available date to the originally requested page.

18        12.    The Archive also accepts donated material from individual patrons, including audio
19
     and video recordings that belong in a library. Thus, members of the public directly contribute
20
     resources to the Archive's digital collection. As with the other materials available on the Archive,
21
22   the Archive provides permanent, archival storage and preservation services for this digital material

23   to ensure that it remains accessible.

24        13.    As a library, the Archive actively works to serve its patrons as a resource for

25   exploration, research, and learning. The Archive seeks to provide a safe environment for its

26   patrons' contribution of and access to digital materials through its website. Accordingly, an

27   individual wishing to view digital materials on the Archive's website may do so as an "anonymous

28

1    user" – that is to say, without logging in to the website. However, individuals who would like to

2    upload materials, post reviews, or communicate on message boards must first register with the

3    Archive, which includes agreeing to "Terms of Use," providing a "valid" (although unverified) e-

4

5    mail address, creating a password, and supplying a screen name. They can then log in to their

6    accounts to engage in these activities.

7        14.     While the Archive intentionally limits the information that it collects and retains

8    from patrons, from time to time it may possess non-public information about them. Such records

9    may include the date the patron's account was opened, the screen names associated with the

10    patron's account, an unconfirmed email address associated with the patron, and messages of those

11    who communicate with the Archive via email.

12

13                      <u>The November 2007 NSL</u>

14        15.     The Archive has worked with various federal government agencies including the

15    Department of Justice, the Federal Bureau of Investigation and the Central Intelligence Agency.

16    Many U.S. Attorneys and other law enforcement officials find the Archive a valuable resource,

17    and we have regularly received requests for information about our collections, most frequently the

18    Wayback Machine. The Archive has in the past complied with lawful subpoenas.

19        16.     Attorneys employed by the Electronic Frontier Foundation ("EFF") represent the

20    Archive for the purpose of responding to government requests for information from the Archive.

21

22        17.     On or around June 4, 2007, Special Agent Scott Rakowitz of the San Francisco

23    office of the Federal Bureau of Investigation contacted the Archive to schedule a liaison meeting.

24    The Archive asked EFF Senior Staff Attorney Kurt Opsahl to follow up with Special Agent

25    Rakowitz. The meeting eventually occurred on or around July 5, 2007. As a result of that meeting,

26    the FBI agreed to serve any record demands directed to the Archive on the attorneys at EFF as the

27    Archive's counsel for such matters.

28

18.     On November 27, 2007, Kurt Opsahl and EFF staff attorney Marcia Hofmann came to my office to show me a National Security Letter ("NSL") the FBI had served on November 26, 2007.

19.     The NSL directed the Archive to provide information about one of its patrons. Specifically, the NSL states that the Archive is "hereby directed to provide the [FBI] the subscriber's name, address, length of service, and electronic communication transactional records, to include existing transaction/activity logs and all electronic mail (e-mail) header information (not to include message content and/or subject fields)" pertaining to ███████████████████████████████████████████████████████████████████ The NSL also includes a certification that "the information sought is relevant to an authorized investigation to protect against international terrorism or clandestine intelligence activities."

20.     In addition, the letter includes a certification that "disclosure of the fact that the FBI has sought or obtained access to the information sought by this letter may endanger the national security of the United States, interfere with a criminal, counterterrorism, or counterintelligence investigation, interfere with diplomatic relations, or endanger the life or physical safety of a person." The letter states that I am prohibited from "disclosing [the] letter, other than to those to whom disclosure is necessary to comply with the letter or to an attorney to obtain legal advice or legal assistance with respect to this letter."

21.     The NSL statute and the November 2007 NSL have prevented me from disclosing information about the November 2007 NSL to anyone other than my attorneys or those to whom disclosure is necessary in order to comply with the letter.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge and belief.

1    Executed on this day, December 12, 2007.

2

3

4                                          Brewster Kahle

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# EXHIBIT A



Web | Moving Images | Texts | Audio | Software | Education | Patron Info | **About IA**



Home          Donate | Forums | FAQs | Contributions | Terms, Privacy, & Copyright | Contact | Jobs | Bios

Search: [                    ]                    ( Upload )   **Anonymous User**
(All Media Types)  (GO!) Advanced Search                      (login or join us)

---

## Read More

Why the Archive is Building an 'Internet Library'

Future Libraries

Storage and Preservation

Related Projects and Research

Researcher Access

Server Statistics

Archive Statistics

Job Opportunities at the Internet Archive

Report Bugs and Request New Features

Usage Logs

---

**Media Coverage** [more]

Brewster Kahle profiled in GOOD magazine

Podcast of Brewster at South By Southwest!

Nasa and Internet Archive Team to Digitize Space Imagery

OSTI Partners with Internet Archive

Brewster Kahle interviewed in Second Life!

Great Article from WebProNews!

---

### About the Internet Archive



The Internet Archive is a 501(c)(3) non-profit that was founded to build an Internet library, with the purpose of offering permanent access for researchers, historians, and scholars to historical collections that exist in digital format. Founded in 1996 and located in the Presidio of San Francisco, the Archive has been receiving data donations from Alexa Internet and others. In late 1999, the organization started to grow to include more well-rounded collections. Now the Internet Archive includes texts, audio, moving images, and software as well as archived web pages in our collections.

### Why the Archive is Building an 'Internet Library'

Libraries exist to preserve society's cultural artifacts and to provide access to them. If libraries are to continue to foster education and scholarship in this era of digital technology, it's essential for them to extend those functions into the digital world.

Many early movies were recycled to recover the silver in the film. The Library of Alexandria - an ancient center of learning containing a copy of every book in the world - was eventually burned to the ground. Even now, at the turn of the 21st century, no comprehensive archives of television or radio programs exist.

But without cultural artifacts, civilization has no memory and no mechanism to learn from its successes and failures. And paradoxically, with the explosion of the Internet, we live in what Danny Hillis has referred to as our "digital dark age."

The Internet Archive is working to prevent the Internet - a new medium with major historical significance - and other "born-digital" materials from disappearing into the past. Collaborating with institutions including the Library of Congress and the Smithsonian, we are working to preserve a

---

Cnet Article- Grant Funds
Open-Source Challenge to
Google Library

Ap Story Picked up by
several major publications!

Forbes.com picks up AP
story on the Archive! "When
a website dies, it goes to
Heaven..."

SF Chronicle spotlights Tech
Award winners

Member



ALA

record for generations to come.

Open and free access to literature and other writings has long been
considered essential to education and to the maintenance of an open
society. Public and philanthropic enterprises have supported it through
the ages.

The Internet Archive is opening its collections to researchers, historians,
and scholars. The Archive has no vested interest in the discoveries of
the users of its collections, nor is it a grant-making organization.

At present, the size of our Web collection is such that using it requires
programming skills. However, we are hopeful about the development of
tools and methods that will give the general public easy and meaningful
access to our collective history. In addition to developing our own
collections, we are working to promote the formation of other Internet
libraries in the United States and elsewhere.

**Find out**
- How to make a Monetary Donation to the Archive
- About our announcement and discussion lists on Internet libraries and
movie archives
as well as our user forums

**Future Libraries - How People Envision Using Internet Libraries**

**From ephemera to artifact:** Internet libraries can change the content of
the Internet from ephemera to enduring artifacts of our political and
cultural lives.

> "I believe historians need every possible piece of paper
> and archived byte of digital data they can muster. The
> Smithsonian Institution sees the value, and has affiliated
> with the Archive to preserve the 1996 campaign Web sites,
> official and unofficial."

Dan Gillmor, computing editor, *San Jose Mercury News*, 1 September
1996

**Protecting our right to know:** Most states have pre-Internet sunshine
laws that require public access to government documents. Yet while the
Internet has generally increased public access to information, states have
just begun to amend those laws to reflect today's Internet environment.
According to Bill Chamberlin, director of the Marion Brechner Citizen
Access Project at the University of Florida's College of Journalism and
Communications, such laws are being enacted "piecemeal, one state at
a time," and cover information that varies widely in nature - everything
from "all public records" to specialized information such as education
reports and the licensing status of medical practitioners. In the meantime,
while public officials are posting more information on the Internet than
their state legislatures require, there's little regulatory control over exactly
what is posted, when it's taken off, or how often it's updated. This leaves
a gap that online libraries can help to fill.

**Exercising our "right to remember":** Without paper libraries, it would
be hard to exercise our "right to remember" our political history or hold
government accountable. With much of the public's business now moving

from paper to digital media, Internet libraries are certain to become essential in maintaining that right. Imagine, for instance, how news coverage of an election campaign might suffer if journalists had only limited access to previous statements that candidates had made in the media.

> "The Internet Archive is a service so essential that its founding is bound to be looked back on with the fondness and respect that people now have for the public libraries seeded by Andrew Carnegie a century ago.... Digitized information, especially on the Internet, has such rapid turnover these days that total loss is the norm. Civilization is developing severe amnesia as a result; indeed it may have become too amnesiac already to notice the problem properly. The Internet Archive is the beginning of a cure - the beginning of complete, detailed, accessible, searchable memory for society, and not just scholars this time, but everyone."

> Stewart Brand, president, The Long Now Foundation

**Establishing Internet centers internationally:** What is a country without a memory of its cultural heritage? Internet libraries are the place to preserve the aspect of a country's heritage that exists on the Internet.

**Tracing the way our language changes:** During the late 19th century, James Murray, a professor at Oxford University, built the first edition of the *Oxford English Dictionary* by sending copies of selected books to "men of letters" who volunteered to search them for the first occurrences of words and to trace the migration of their various meanings. Internet libraries could allow linguists to automate much of this extremely labor-intensive process.

**Tracking the Web's evolution:** Historians, sociologists, and journalists could use Internet libraries to hold up a mirror to society. For example, they might ask when different ethnic groups or special interests or certain businesses became a presence on the Internet.

> "We don't know where this Internet is going, and once we get there it will be very instructive to look back."

> Donald Heath, president of the Internet Society in Reston, Virginia

**Reviving dead links:** A few services - such as UC Berkeley's Digital Library Project, the Online Computer Library Center, and Alexa Internet are starting to offer access to archived versions of Web pages when those pages have been removed from the Web. This means that if you get a "404 - Page Not Found" error, you'll still be able to find a version of the page.

**Understanding the economy:** Economists could use Archive data such as link structures - what and how many links a site contains - to investigate how the Web affects commerce.

**Finding out what the Web tells us about ourselves:** Researchers could use data on links and traffic to better understand human behavior and communication.

"Researchers could use the Archive's Web snapshots in combination with usage statistics to compare how people in different countries use the Web over long periods of time.... Political scientists and sociologists could use the data to study how public opinion gets formed. For example, suppose a device for increasing privacy became available: Would it change usage patterns?"

Bernardo Huberman, <u>Xerox Palo Alto Research Center</u>

"The Internet Archive has created a kind of test tube that allows a broad range of researchers to analyze the Web in ways that have never been possible before. What makes this type of research unique is that it often requires the fusion of traditional tools and techniques with new methods, and it results in the development of new theories, techniques, and metrics."

James Pitkow, <u>Xerox Palo Alto Research Center</u>

**Looking back:** With a "way-back machine" - a device that displayed the Web as it looked on a given date - historians and others would literally have a window on the past.

<u>How would you use an Internet library</u>?

**Related Projects and Research**

Internet libraries raise many issues in a range of areas, including archiving technology, copyright, privacy and free speech, trademark, trade secrets, import/export issues, stolen property, pornography, the question of who will have access to the libraries, and more.

Below are links to projects, resources, and institutions related to Internet libraries.

> <u>Internet Libraries and Librarianship</u>
> <u>Archiving Technology</u>
> <u>Internet Mapping</u>
> <u>Internet Statistics</u>
> <u>Copyright</u>
> <u>Privacy and Free Speech</u>

**Internet Libraries and Librarianship**

> **Alexa Internet** has catalogued Web sites and provides this information in a free service.
> <u>www.alexa.com</u>

> **The American Library Association** is a major trade association of American libraries.
> <u>www.ala.org</u>

> **The Australian National Library** collects material including organizational Web sites.
> <u>pandora.nla.gov.au/documents.html</u>

> **The Council on Library and Information Resources**

works to ensure the well-being of the scholarly
communication system.
www.clir.org
See its publication **Why Digitize?** at
www.clir.org/pubs/reports/pub80-smith/pub80.html

**The Digital Library Forum (D-Lib)** publishes an online
magazine and other resources for building digital libraries.
www.dlib.org

**Attorney I. Trotter Hardy** explains copyright law and
examines its implications for digital materials in his paper
**Internet Archives and Copyright.**
copyright_TH.php

**The Internet Public Library** site has many links to online
resources for the general public.
www.ipl.org

**Brewster Kahle** is a founder of WAIS Inc. and Alexa
Internet and chairman of the board of the Internet Archive.
See his paper **The Ethics of Digital Librarianship** at
ethics_BK.php

**Michael Lesk** of the National Science Foundation has
written extensively on digital archiving and digital libraries.
www.purl.net/NET/lesk

**The Library of Congress** is the national library of the
United States.
www.loc.gov

**The Museum Digital Library** plans to help digitize
collections and provide access to them.
www.digitalmuseums.org

**The National Archives and Records Administration**
oversees the management of all US federal records. It also
archives federal Web sites including the Clinton White
House site.
www.nara.gov

**The National Science Foundation Digital Library
Program** has funded academic research on digital libraries.
www.nsf.gov/home/crssprgm/dli/start.htm

**National Technical Information Service (NTIS)**, U.S.
Department of Commerce, Technology Administration.
NTIS is an archive and distributor of scientific, technical,
engineering and business related information developed by
and for the federal government.
www.ntis.gov

**Network Wizards** has been tracking Internet growth for
many years.
www.nw.com

**Project Gutenberg** is making ASCII versions of classic

literature openly available. www.gutenberg.org

**The Radio and Television Archive** has many links to related resources.
www.rtvf.unt.edu/links/histsites.htm

**Revival of the Library of Alexandria** is a project to revive the ancient library in Egypt.
www.bibalex.org

**The Society of American Archivists** is a professional association focused on ensuring the identification, preservation, and use of records of historical value.
www.archivists.org

**The Royal Institute of Technology Library in Sweden** is creating a system of quality-assessed information resources on the Internet for academic use.
www.lib.kth.se/main/eng

**The United States Government Printing Office** produces and distributes information published by the US government.
www.access.gpo.gov

**The University of Virginia** is building a catalog of digital library activities.
http://www.lib.virginia.edu/digital/

**Archiving Technology**

**The Association for Computing Machinery (ACM) computing and public policy page** includes papers and news on pending legislation on issues including universal access, copyright and intellectual property, free speech and the Internet, and privacy.
www.acm.org/serving

**The Carnegie Mellon University Informedia Digital Video Library Project** is studying how multimedia digital libraries can be established and used.
www.informedia.cs.cmu.edu

**The Intermemory Project** aims to develop highly survivable and available storage systems.
www.intermemory.org

**The National Film Preservation Board**, established by the National Film Preservation Act of 1988, works with the Library of Congress to study and implement plans for film and television preservation. The site's research page includes links to the board's 1993 film preservation study, a 1994 film preservation plan, and a 1997 television and video study. All the documents warn of the dire state of film and television preservation in the United States.
lcweb.loc.gov/film/filmpres.html

**The National Institute of Standards and Technology**

(NIST) posts IEC International Standard names and symbols for prefixes for binary multiples for use in data processing and data transmission.
www.physics.nist.gov/cuu/Units/binary.html

The Text Retrieval Conference (TREC) encourages research in information retrieval from large text collections.
trec.nist.gov

## Internet Mapping

An Atlas of Cyberspaces has maps and dynamic tools for visualizing Web browsing.
www.cybergeography.com/atlas/surf.html

The Internet Mapping Project is a long-term project by a scientist at Bell Labs to collect routing data on the Internet.
www.cs.bell-labs.com/who/ches/map

The Matrix Information Directory Service has good maps and visualizations of the networked world.
www.mids.org

Peacock Maps has maps of Internet connectivity.
www.peacockmaps.com

## Internet Statistics

WebReference has an Internet statistics page (publisher: Internet.com).
webreference.com/internet/statistics.html

## Copyright

The Association for Computing Machinery (ACM) copyright information page includes text of pertinent laws and pending legislation.
www.acm.org/usacm/copyright

Tom W. Bell teaches intellectual property and Internet law at Chapman University School of Law.
www.tomwbell.com
His site includes a graph showing the trend of the maximum US copyright term at
www.tomwbell.com/writings/(C)_Term.html

Cornell University posts the text of copyright law at
www4.law.cornell.edu/uscode/unframed/17/107.html
www4.law.cornell.edu/uscode/unframed/17/108.html

The Digital Future Coalition is a nonprofit working on the issues of copyright in the digital age.
www.dfc.org

The National Academy Press is the publishing arm of the national academies.
"The Digital Dilemma: Intellectual Property in the Information Age"
http://www.nap.edu/html/digital_dilemma/

"LC21: A Digital Strategy for the Library of Congress"
www.nap.edu/books/0309071445/html

**Pamela Samuelson** is a professor in the School of
Information Management and Systems at UC Berkeley.
info.berkeley.edu/~pam

**Title 17 of US copyright code**
www.loc.gov/copyright/title17/

**US Government Copyright Office**
www.loc.gov/copyright

Privacy and Free Speech

**The Association for Computing Machinery (ACM) free-
speech information page** includes the text of pertinent
laws and pending legislation.
www.acm.org/usacm/speech

**The Association for Computing Machinery (ACM)
privacy information page** includes the text of
congressional testimony and links to other resources.
www.acm.org/usacm/privacy

**The Benton Foundation Communications Policy and
Practice Program** has the goal of infusing the emerging
communications environment with public-interest values.
www.benton.org/cpphome.html

**The Center for Democracy and Technology** works to
promote democratic values and constitutional liberties in
the digital age.
www.cdt.org

**The Computers Freedom and Privacy Conference** has a
site containing information on each annual conference held
since 1991.
www.cfp.org

**The Electronic Frontier Foundation** works to protect
fundamental civil liberties, including privacy and freedom of
expression in the arena of computers and the Internet.
www.eff.org

**The Electronic Privacy Information Center,** a project of
the Fund for Constitutional Government, is a public-interest
research center whose goal is to focus public attention on
emerging civil liberties issues and to protect privacy, the
First Amendment, and constitutional values.
www.epic.org

**The Free Expression Policy Project** is a think tank on
artistic and intellectual freedom at NYU's Brennan Center
for Justice. Through policy research and advocacy, they
explore freedom of expression issues including censorship,
copyright law, media localism, and corporate media reform.
www.fepproject.org

**The Internet Free Expression Alliance** is an information and advocacy organization focused on free speech as it relates to the Internet.
www.ifea.net

**The Internet Privacy Coalition** aims to protect privacy on the Internet by promoting the widespread availability of strong encryption and the relaxation of export controls on cryptography.
www.privacy.org/ipc

**The Privacy Page** includes news, alerts, and links to privacy-related resources. Related organizations include the Electronic Privacy Information Center, the Internet Privacy Coalition, and Privacy International.
www.privacy.org

**Privacy International** is a London-based human rights group formed as a watchdog on surveillance by governments and corporations.
www.privacy.org/pi

Please suggest other pages that may be appropriate here.

## Storage and Preservation

The Archive has two practical considerations in dealing with digital collections:

> How to store massive amounts of data
> How to preserve the data for posterity

## Storage

Storing the Archive's collections involves parsing, indexing, and physically encoding the data. With the Internet collections growing at exponential rates, this task poses an ongoing challenge.

Our hardware consists of PCs with clusters of IDE hard drives. Data is stored on DLT tape and hard drives in various appropriate formats, depending on the collection. Web data is received and stored in archive format of 100-megabyte ARC files made up of many individual files. Alexa Internet (currently the source of all crawls in our collections) is proposing ARC as a standard for archiving Internet objects. See Alexa for the format specification.

## Preservation

Preservation is the ongoing task of permanently protecting stored resources from damage or destruction. The main issues are guarding against the consequences of accidents and data degradation and maintaining the accessibility of data as formats become obsolete.

> **Accidents:** Any medium or site used to store data is potentially vulnerable to accidents and natural disasters. Maintaining copies of the Archiveï¿½s collections at multiple sites can help alleviate this risk. Part of the collection is already handled this way, and we are

proceeding as quickly as possible to do the same with the rest.

**Migration:** Over time, storage media can degrade to a point where the data becomes permanently irretrievable. Although DLT tape is rated to last 30 years, the industry rule of thumb is to migrate data every 10 years. Given developments in computer hardware, we will likely migrate more often than that.

**Data formats:** As advances are made in software applications, many data formats become obsolete. We will be collecting software and emulators that will aid future researchers, historians, and scholars in their research.

### Find out

How to get free access to the Archive's Internet collections
About our announcement and discussion lists on Internet libraries and movie archives

Terms of Use (10 Mar 2001)

# EXHIBIT B



December 13, 2006

**CALIFORNIA**
**STATE LIBRARY**
FOUNDED 1850

Mr. Mel Blackwell
Vice President, Schools & Libraries Division
USAC
2000 L Street, N.W., Suite 200
Washington, D.C. 20036

Dear Mr. Blackwell,

This letter serves as a certification that the Internet Archive is eligible to receive federal Library Services and Technology Act (LSTA) funding during July 1, 2007 – June 30, 2008.

As a library eligible to receive LSTA funding, it is an eligible entity for E-Rate funding as well.

Please feel free to contact my Library Development Services Bureau Chief, Tom Andersen, should you need further assistance or information. He can be reached at (916) 653-7391 or email at tandersen@library.ca.gov.

Yours truly,

Susan Hildreth
State Librarian of California

cc:    Tom Andersen
       Jacques Cressaty, Internet Archive

Library - Courts Building               P.O. Box 942837               Sacramento, CA 94237-0001